[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This negligence case, which has been tried to the Court, presents a variation of Purzycki v. Town of Fairfield, 244 Conn. 101, 708 A.2d 937
(1998). Purzycki holds that a child who has been tripped by another student in a school hallway comes within the "imminent harm" exception to the doctrine of governmental immunity for discretionary acts performed by municipal employees. This case involves a child assaulted by another student in a school cafeteria after a school administrator had been informed that morning that the same assailant had attacked the same victim on the previous day. For the reasons that follow, the school CT Page 14252 administrator had a duty to use reasonable care to protect the child in question and breached that duty.
This action was commenced by service of process in March 1997. The plaintiff's are Robert James Kendall, III ("Robert"), a minor, and his parents, Robert James Kendall, Jr. and Josie Bell Kendall. The present defendants (some former defendants being no longer in the case) are the West Haven Board of Education (misdescribed in the summons and case caption as the "West Haven Department of Education"); Sharon Chain, who was, at the time in question, a teacher at the May V. Carrigan Middle School in West Haven ("the "school"); Frank J. Raffone ("Raffone"), who was the principal of the school; and Jane Summa Raffone ("Summa), who was the assistant principal.
The plaintiffs' second revised complaint consists of four counts. Count One, which inaccurately describes Raffone as the Superintendent of Schools, alleges that Robert was injured as a result of Raffone's negligence. Count Two, which inaccurately describes Summa as the Principal of the school, alleges that Robert was injured as a result of Summa's negligence. Count Three alleges that Robert was injured as a result of Chain's negligent supervision. Count Four alleges that the Board of Education is liable to the plaintiff's in accordance with Conn. Gen. Stat. § 7-465 (a).
The case was tried to the Court on October 11 and 12, 2000. Following posttrial briefing, the case was argued on November 16, 2000.
The evidence establishes the following facts. In June 1995, Robert was an eleven-year-old student in sixth grade. He was enrolled in a special education class in the school. Robert is an African American of slight build. Another sixth grade special education student in the same class, Scott Tucker ("Scott"), was white. Over a period of at least a few days in June 1995, Scott repeatedly tormented Robert because of Robert's race. Scott pushed Robert in the halls, cursed at him, called him racial epithets, and spit at him. In spite of the fact that all of this tormenting occurred on school property, the school's teachers and administrators were completely oblivious to Scott's behavior.
One of these episodes occurred on June 14, 1995. That evening, Robert — who had not previously responded to Scott's tormenting — told his parents what had happened. His parents told him to tell the school's administrator the next morning.
On the morning of June 15, 2000, shortly after Robert had arrived at school, he told Summa that Scott had, on the previous day, pushed him, spit on him, and called him "monkey" and "nigger." Summa said that she CT Page 14253 would take care of it.
A few minutes later, Robert's mother, who had been parking her car while Robert spoke to Summa, came into the school and spoke to Summa herself. She told Summa that Scott had spit on Robert and asked if she could take Robert out of school so that he wouldn't get hurt. (It was about three days before the end of the school year.) Summa told Robert's mother that she disagreed, and that it wouldn't be necessary.
In spite of her assurances to both Robert and his mother, Summa did absolutely nothing in response to the information she had just received. Summa instead left the school within a few minutes for an education conference in Hamden and did not return that day.
The assault complained of in this case occurred in the school cafeteria at lunchtime. The cafeteria was a large room containing three teachers who had drawn lunchroom duty and about three dozen students. The teacher-student ratio happened to be higher than usual that day because a number of students were on a field trip, but — significantly — the deployment of the teachers was the same as it usually was. One teacher monitored the lunch line, a second teacher (Chain) stood by an exit to prevent unauthorized departures, and a third teacher was selling candy. Summa's duties included a supervisory role with respect to the cafeteria, but (as mentioned) she was no longer on the school grounds, and she had told none of the teachers who were present about Scott's threatening behavior toward Robert. Consequently, no change had been made to the usual routine. The teachers were deployed as just described, and the students were to sit at tables near the entrance until their table was called to the lunch line.
Within second of Robert's entry into the cafeteria, Scott assaulted him. This assault was serious. Scott threw cookies at Robert and cursed him. Robert tried to walk away. Scott came up behind him, put Robert's head in a wrestling hold, and tripped his feet. Robert fell to the floor face first like a toppled tree. When he hit the ground his two front teeth were knocked out of his head, and his jaw was broken on both sides. All of this happened in seconds. The teachers in the cafeteria were completely oblivious as to what had happened until Chain saw Scott trying to escape.
Robert suffered serious injuries as a result of the cafeteria assault. As an immediate consequence of the assault, he suffered great pain and fear. As mentioned, two front teeth were knocked from his head, and his jaw was fractured on both sides. The teeth were retrieved, and a dentist subsequently reimplanted them. While the teeth are currently doing well, the dentist credibly testified that, over the course of time, it is CT Page 14254 likely that Robert's body will treat the teeth as a foreign object and reject them. Robert's existing dental bills are $1,330. The (additional) cost of replacement teeth will be at least $4,000.
To repair Robert's broken jaw, his teeth had to be wired shut for six weeks. This required surgery under general anesthesia. During this period of recuperation, Robert was in much physical discomfort and could nourish himself only by sipping Ensure through a straw. He lost ten pounds during this period in spite of the fact that he was a slight child to begin with. Fortunately, his jaw has successfully healed. There is no medical evidence of any permanent impairment. His surgical bills total $2,020.
As mentioned, Robert suffered great fear and pain following the assault in question. The medical evidence submitted to the Court establishes that he has no permanent physical disabilities caused by the assault, with the significant exception of his two front teeth, which will eventually have to be replaced. The credible evidence also establishes that Robert suffered some short term emotional trauma as a result of the assault, including nightmares and fear of other persons. Robert has subsequently been treated by a psychologist, but unhappily no psychological records were introduced into evidence. On this state of the evidence, the Court cannot find that Robert has suffered any permanent psychological or psychiatric trauma as a result of the assault.
In determining the liability of the various individual defendants, it will be helpful to keep in mind the analytical framework of Purzycki v.Town of Fairfield, supra. Purzycki explains that, "Although municipalities are generally immune from liability in tort, municipal employees historically were personally liable for their own tortious conduct. . . . The doctrine of governmental immunity has provided some exceptions to the general rule of tort liability for municipal employees." 244 Conn. at 107. (Internal quotation marks and citations omitted.) Because of this framework, it will be helpful to determine whether any of the individual defendants here — all of whom are municipal employees — would be liable to the plaintiff's under the common law of negligence. As will be seen, this question must be answered affirmatively as to Summa and negatively as to Raffone and Chain. It will then be necessary to determine whether Summa is protected by the doctrine of governmental immunity.
It will be helpful to consider Summa's liability first, for the case against her is by far the strongest of the cases against the three individual defendants. The question of whether she had a duty of care toward Robert is a matter of law for the Court to determine. "A duty to act with reasonable care to prevent harm to a plaintiff which, if violated, may give rise to tort liability is based on a "special CT Page 14255 relationship' between the plaintiff and the defendant." Burns v. Board ofEducation, 228 Conn. 640, 646, 638 A.2d 1 (1994). (Internal quotation marks and citations omitted.) As Burns explains, "school children attending public schools during school hours are intended to be the beneficiaries of certain duties of care." Id. at 648. Moreover, "[t]he presence of the plaintiff child on the school premises where he was injured was not voluntary. . . . [H]e was statutorily compelled to attend school." Id. at 649. Under these circumstances, Summa, whose general supervisory authority extended to the school cafeteria, had the duty to protect the plaintiff student "from dangers that may reasonably be anticipated." Id. "As a matter of policy, this conclusion comports with our case law that has traditionally recognized that children require special consideration when dangerous conditions are involved." Id. at 650.
Given the Court's findings that Summa had been informed by both Robert and his mother on the morning of June 14, 1995, that Robert had been physically attacked and racially vilified by Scott on the previous day, Summa had a legal duty to Robert to protect him from further attacks by Scott. Unhappily, although Summa assured both Robert and his mother that she would take care of the problem, the evidence unambiguously establishes that she did nothing. She instead left the school grounds for the day without investigating the problem or telling anyone about it. Because of her inaction, the teachers assigned to the cafeteria had no warning as to the problem. It would have been easy enough for Summa to tell the teachers assigned to the cafeteria to watch out for a problem between Scott and Robert or to keep the two away from each other, but Summa did nothing. The evidence also establishes that Summa was well aware of the usual deployment of teachers in the cafeteria. This deployment was manifestly inadequate to prevent a sudden attack by one student upon another near the entrance to the cafeteria. Under these circumstances, Summa failed to use reasonable care to protect Robert from Scott. Her failure to use reasonable care was a proximate cause of Robert's injuries. If Summa had informed the teachers in the cafeteria of the problem, any one of those teachers could easily have prevented the assault. Because Summa breached her duty to use reasonable care to protect Robert and because that breach was a proximate cause of the plaintiff's injuries, Summa's common law liability to the plaintiff's is established.
The evidence does not establish the liability of Raffone and Chain. While Raffone and Chain, like Summa, had a duty to protect Robert from dangers that reasonably could have been anticipated, the evidence shows that neither of them breached this duty.
Chain was in the cafeteria when the assault occurred but was positioned CT Page 14256 sufficiently far away from the location of the assault that she could have done nothing to prevent it. of course, given some advance warning, Chain could have prevented the assault, but the responsibility for her lack of advanced warning is not hers but Summa's. The evidence shows that Chain did not become aware of Robert's plight until several minutes after the assault because she was busy chasing Scott, who was trying to escape. There is no evidence, however, that Robert suffered any harm as a result of any post-assault delay in coming to his aid. On the contrary, the evidence establishes that all of Robert's injuries were caused by his initial fall to the floor. There is no evidence that he would have benefitted from any post-assault attention that was speedier than that which he actually received. Chain did not fail to exercise due care under the circumstances.
Although Burns v. Board of Education, supra, holds that "the superintendent of schools bears the responsibility for failing to act to prevent the risk of imminent harm to school children as an identifiable class of beneficiaries of his statutory duty of care," 228 Conn. at 649, the evidence clearly fails to establish the plaintiffs' allegation that Raffone was the Superintendent of Schools. He was, instead, the principal of the school where the assault in question occurred. In that capacity, he could undoubtedly be held liable for injury for negligence if he could have reasonably foreseen that his conduct — or inaction — would result in injury. If Raffone had acquired either actual knowledge of Scott's abuse of Robert or had learned of facts that would lead a reasonable person to conclude that Robert had been abused, he would be subject to liability if his level of supervision had been unreasonable and had been a proximate cause of Robert's injuries. See Marquay v. Eno,662 A.2d 272, 279 (N.H. 1995). But the evidence here establishes no such basis of liability. The evidence instead establishes that Raffone knew nothing of the trouble between Scott and Robert until long after the assault in question had occurred. There is no evidence that Raffone knew of any facts that would have led a reasonable person to conclude that Robert had been abused. There is, in addition, no credible evidence that Raffone's training of the teachers or administrators at the school was inadequate. There is, consequently, no evidentiary basis for a finding that Raffone failed to exercise due care under the circumstances.
Count Four of the second revises complaint is directed against the Board of Education. The Board, however, is sued only pursuant to Conn. Gen. Stat. § 7-465 (a). At argument, the attorney for all of the defendants represented that the Town of West Haven will pay any sums which any individual defendant becomes obligated to pay in this action. Under these circumstances, all parties agree that no judgment should enter on Count Four. CT Page 14257
For the reasons discussed above, Summa is the only individual defendant who would be liable to the plaintiff's under the common law of negligence. The next question that must be addressed is whether Summa is protected by the doctrine of governmental immunity. The determination of whether qualified immunity applies is a question of law for the Court.Purzycki v. Town of Fairfield, supra, 244 Conn. at 107.
Any duty owed by Summa to Robert was discretionary, not ministerial in nature. "Therefore, in order to prevail, the plaintiffs' claim must fall within one of the recognized exceptions to qualified immunity for discretionary acts." Purzcyki v. Town of Fairfield, supra,244 Conn. at 108. The only such exception relevant here "is the exception permitting a tort action in circumstances of likely imminent harm to an identifiable person." Id.
This case presents a classic example of "likely imminent harm to an identifiable person." The evidence leaves no doubt that Robert was specifically identified as the victim of Scott's physical attacks and racial harassment. As such, he was infinitely more "identifiable" than the schoolchild who slipped and fell due to icy conditions in Burns and or the schoolchild who was tripped in the hall in Purzycki. If the schoolchildren in Burns and Purzcyki were "identifiable," as the Supreme Court later held them to be, Robert was obviously "identifiable" as well. The imminent harm" prong of the test is also even more readily satisfied here than it was in Burns and Purzcyki. Here the same victim (Robert) had been attacked by the same assailant (Scott) on the previous day. Given the information presented to her, Summa had ample reason to foresee the danger to Robert that could — and did — occur on June 15, 1995.
Under these circumstances, Summa is liable to the plaintiff's in negligence and is not protected by the doctrine of governmental immunity.
The issue of damages must now be considered. The credible evidence, described above, establishes that the plaintiffs' economic damages total $7,350. This amount includes a dental bill of $1,330, a future dental bill of $4,000 for the replacement of Robert's front teeth, and a surgical bill of $2,020.
The plaintiffs' noneconomic damages must include fair, just, and reasonable compensation for Robert's immediate pain and terror involving the assault itself, Robert's pain and suffering surrounding the jaw surgery and dental repair that he underwent shortly after the assault, Robert's discomfort and inconvenience over the six week period in which his jaw was wired shut, the emotional trauma that Robert has suffered as CT Page 14258 a result of the assault, and the probable pain and discomfort that Robert will experience in the future when his body rejects his two reimplanted teeth and those teeth are dentally replaced. The calculation of these noneconomic damages is necessarily judgmental. The Court determines that the appropriate amount of noneconomic damages in this case is $60,000.
Judgment shall consequently enter as follows.
On Count One (directed at Raffone), judgment shall enter in favor of the defendant.
On Count Two (directed at Summa), judgment shall enter in favor of the plaintiff's against the defendant. Damages are awarded as follows: Economic damages — $7,350; noneconomic damages — $60,000; total damages — $67,350.
On Count Three (directed against Chain), judgment shall enter in favor of the defendant. For reasons discussed above, no judgment shall enter on Count Four.
 Jon C. Blue Judge of the Superior Court